WESTERN ASSURANCE COMPANY *v.* MARY B. PHELPS.

1. INSURANCE.   *Contracts.   Valued policy.   Three-quarters clause.   Laws* 1896, *p.* 68.

    The three-quarters clause in a policy of fire insurance issued under the valued policy statute (Laws 1896, p. 68), providing that fire insurance companies shall not, when sued upon policies, deny that the property was worth the full value upon which the insurance was calculated, is nugatory.

2. SAME.   *Laws.*

    Existing laws are necessarily referred to in all contracts made thereunder, and cannot be changed by agreement of the parties.

3. SAME.

    The statute supervenes all policies, and writes out of them all stipulations inconsistent with itself.

4. SAME.   *Concurreent insurance.*

    Where several concurrent policies have been written on the same property, with the consent of the respective companies, each company, under the statute, is liable for the full amount of its policy.

5. SAME.   *Waiver.*

    The statute is not waived by the insured accepting a policy the terms of which prescribe a different rule than the one laid down in the statute for fixing the amount of the loss to be paid.

FROM the circuit court of Warren county.

HON. WILLIAM K. MCLAURIN, Judge.

Mary B. Phelps, the appellee, was the plaintiff in the court below; the Western Assurance Co., the appellant, was defendant there.   The suit was upon a policy of fire insurance, issued September 3, 1896, which contained, among others, the following clauses:

"*Three-fourth clause.*—It is understood and agreed that, for and in consideration of the rate of premium fixed in this policy,

77 Miss.—40

the assured become a co-insurer with the company to the amount
of one-fourth of any loss or damage which may occur to the
property hereby insured, and hereby agrees to maintain this
proportion throughout, not only the term of this policy, but
also any renewal thereof with this company, and in event of
other insurance permitted, this company shall be liable only for
its proportion of three-fourths of any loss or damage from fire.
The assured furthermore covenants and agrees with this com-
pany not to insure any item under this application and policy
for over three-fourths of its actual cash value during the con-
tinuance of this insurance.

"*Concurrent insurance clause.*—This company shall not be
liable under this policy for a greater proportion of any loss
on the described property, or for loss by and expense of removal
from premises endangered by fire, than the amount hereby in-
sured shall bear to the whole insurance, whether valid or not,
or by solvent or insolvent insurers, covering such property, and
the extent of the application of the insurance under this policy,
or of the contribution to be made by this company in case of
loss, may be provided for by agreement or condition written
hereon or attached or appended hereto."

There were two trials in the court below. On the first one the
verdict and judgment was for defendant, which, upon motion
for a new trial, was set aside; on the second trial a peremptory
instruction was given for plaintiff, directing the finding of the
full sum of the policy, and verdict and judgment having been
rendered thereon, the defendant appealed. The opinion of the
court shows the contentions.

*Theodore McKnight,* for appellant.

Klein, the then agent of the company, and now principal
witness for appellee, says that he got the policy from Dr. Phelps
after the fire, and that he placed the indorsement thereon allow-
ing additional insurance after the fire.

If the policy was delivered and accepted before the fire, what
business had Klein with it after the fire?

Why did Phelps place it in the hands of Klein, the agent of the company after the fire?

The only answer, not speculative and within the record, is that the policy was given to Klein by Phelps for the purpose of having that done which was done, to wit, to place thereon the indorsement allowing additional insurance.

I most respectfully submit that the facts and circumstances above mentioned, together with all the facts and circumstances of record in this case, raise a question of fact which should have been submitted to the jury, as to whether Phelps had notice of the limitation upon the power of the agent to allow additional insurance. *Railroad Co.* v. *Boehme,* 70 Miss., 11; *Holmes* v. *Simon,* 71 Miss., 245; *Tribette* v. *Railroad Co.,* 71 Miss., 212.

The instruction on this feature of the case asked by the appellant and refused by the court, was correct, and should have been given, being supported by the opinion of the court in the case of *Rivara* v. *Ins. Co.,* 62 Miss., 728, where Judge Arnold said: "The power of insurance agents to bind their companies are varied by the character of the functions they are employed to perform. Their powers in this respect may be limited by the companies, but parties dealing with them as to matters in the real or apparent scope of their agency are not affected by such limitations, unless they had notice of the same. *Phoenix Ins. Co.* v. *Bowdre,* 67 Miss., 633.

The peremptory instruction as to the sum awarded plaintiff is in the face of the terms of the policy. See three-fourth clause and concurrent insurance clause.

*Miller & Baskin,* on the same side.

We call the court's attention to the following authorities as to whether the present policy of insurance was a complete contract: *Idaho Forwarding Co.* v. *Firemans' Funds Insurance Co.,* 29 Pac. Rep., 826 (8 Utah, 41); *Baumgartel* v. *Insurance Co.,* 136 N. Y., 547 (32 N. E., 990); *National Life Insurance Co.* v. *Minch,* 53 N. Y., 150; *Smith* v. *Insurance Co.,* 24 Pa.

St., 320; *Centennial Mutual Life Association Co.* v. *Parham,* 80 Tex., 518 (16 S. W.; 316).

Surely the court below erred in peremptorily instructing the jury to find the entire sum named in the policy for plaintiff. So to do was wholly to ignore the three-quarter clause of the policy and the concurrent insurance clause.

The parties were competent to agree to these clauses as parts of their contract, and the appellee is in no position to deny that they did so agree.

*Miller, Smith & Hirsh,* for appellee.*

The act of the legislature of the state of Mississippi, approved March 20, 1896, Laws of 1896), prescribes:

"In suits brought upon policies of insurance against loss by fire, hereafter issued or renewed, the insurer shall not be permitted to deny that the property insured was worth, at the time of issuing the policy, the full value upon which the insurance was calculated. And in case the policy contains a three-quarter valuation clause, the insurer shall not deny that the amount of the policy was but three-fourths of the valuation at the date of its issuance, and the civil rule shall apply, it matters not what proportion the amount of insurance bears to valuation, according to the terms of the policy. In case of total loss of the property, the measure of damages shall be the amount for which the property was insured. In case of partial loss of damage by fire, the measure of damages shall be in the amount equal to the damage done the property, not to exceed the amount written in the policy," etc.

In view of this plain declaration of legislative will, insurance companies cannot now be permitted, we respectfully submit, to rely upon the condition in their policies technically known as the three-quarter clause, or similar agreements, to reduce the amount of recovery. These are simply devices to evade the law, and cannot be tolerated.

---

*The argument of counsel for appellee is printed in full by order of the court.

The insurance company, in accepting a risk, must now determine for itself the valuation of the property. It can insure three-fourths, or one-half, or any proportion of its value, but whatever amount it inserts in its policy is the measure of its liability in the event of total loss, and it cannot escape this responsibility by inserting provisions in its obligations, seeking to impose upon the insured the burden of co-insurer.

When it issues a $2,000 policy and receives the premium therefor, upon a total loss it must pay $2,000, no more and no less. Nor can an insurance company now seek to reduce its indebtedness to the policy holder by conditions diminishing its pecuniary liability in the event of other insurance, to which it has consented. The amount of the policy is practically liquidated damages upon the destruction of the thing insured, and the law, which was enacted to remedy what was considered a mischief or an evil, cannot be impeded, much less defeated, by any contrivances of the insurer, in whatever guise they may appear.

Legislation similar to the statutes in force in Mississippi, has been enacted in other states, and has been the subject of judicial interpretation or construction. One of the leading cases is that of *Havens et al.* v. *Germania Fire Insurance Company et al.* (decided by the supreme court of Missouri June 25, 1894), 123 Mo., 403, s.c. 11 Am. Rd. & Corporation Reports, 578, s.c. 27 S. W., 718.

The Missouri statute (§ 6009, Revised Statutes 1879) provided: "Whenever any policy of insurance shall be written to insure any real property, including the building or buildings owned separate from the realty as well as such or a part of the realty, and the property insured shall be wholly destroyed and without criminal fault on the part of the insured, or his assigns, the amount of the insurance written in such policy shall be taken conclusively to be the true value of the property when insured, and the true amount of loss and measure of damages when destroyed."

In that case the court was called upon to determine the validity of five policies of insurance on the "two-story frame shingle-roof building, with additions, and one-story frame engine and boiler house adjoining, occupied as a steam flouring mill in Waldron, Mo.," but only four of them embraced "the fixed and movable machinery, shafting, and gearing, except the boiler and engine connections contained in the above described building."

Several of the policies contained a stipulation that "in case of loss the damage should be estimated according to the actual cash value of the property at the time of the loss or fire, which should in no case exceed the cost of replacing or restoring the burned property." The court said: "It is assumed by the appellants, that if the conditions as to the subject-matter of the insurance, and the nature of the loss bring these policies within the terms of this section, then the stipulation of the policy must yield to the statute; and this is not seriously controverted by the insurance companies, their only contention being that the case was without the statute."

The court further said: "The defendant, the insurance company, insists that the statute has no application to cases of concurrent insurance, but governs only in cases of single policy."

It was held: "(1) Where the subject-matter of fire insurance, and the nature of the loss are within the revised statutes of Missouri 1879 (§ 6009), the stipulations of the policy must yield to the statute. (2) Where several concurrent policies on the building have been written with the consent of the respective companies, and the building is wholly destroyed, each company is liable for the full amount of its policy under said § 6009."

The court quoted the opinion of Judge Dillon in *White* v. *Insurance Company,* 4 Dill., 177. He there said: "The legislature of Missouri can concede, and, we think, wisely, that the promises held forth to the assured in the policies in general use, were too often a delusion and a snare, and as the

courts were powerless to correct the evil, it ought to be corrected by statute. . . . We are of opinion that the policies issued and delivered in Missouri after that act took effect fall within its protective operation, and as to such policies the act is to be treated as if incorporated therein. . . . The general rule is that laws in existence are necessarily referred to in all contracts made under such laws, and that no contract can change a law," citing cases in Ohio, New Hampshire, Wisconsin, and Maine.

Upon the subject of concurrent insurance the Court said: "We think there can be no valid reason why the mere fact that several companies assumed each a part of the whole risk should affect the operation of the statute. If in order to induce good faith on the part of the insured and thus give greater security to the insurer, the companies desire to make the owner bear a portion of the risk, this protection can readily be secured by limiting the amount of concurrent insurance. The insurance is written by the consent of all the companies, and it must be presumed when each consented to the additional insurance by the others that in its opinion and estimation the total insurance was not excessive or disproportionate to the value of the property. The amount written in each policy is expressly assented to by all the other insurers, and they must be held to agree that the aggregate of their several policies is the value of the property. To hold otherwise is to repeal the statute in every case where there is more than one policy on the same property, whereas it was intended to apply to all. When we consider the well-known custom of the different agencies, representing often a number of companies, and distributing the insurance they write equitably among their several members, we can readily see how easily, under their contention, they can render the statute nugatory in the most important risk. We think the statute is as obligatory in the concurrent as in the single policy. *Barnard* v. *Insurance Co.*, 38 Mo. App., 186; *Oshkosh Gaslight Co.* v. *Germania Fire*

*Insurance Co.,* 71 Wis., 474 (37 N. W., 819) ; *Queen Insurance Co.* v. *Jefferson Ice Co.,* 64 Texas, 578 (27 S. W., 718)."

In the note to this case, in the Am. R. R. & Corp. Reports, the editor, Mr. John Lewis, says : "Where the statute provides in substance that where the property insured is wholly destroyed the amount of the insurance written in the policy shall be taken conclusively to be the true value of the property when insured, and the true amount of loss or measure of damages when destroyed, the statute becomes a part of every contract of insurance, the actual value of property becomes immaterial, and all inconsistent provisions in the policy are rendered nugatory," citing the following cases : *German Ins. Co.* v. *Eddy* (Neb.), 8 Am. R. R. & Corp. Rep., 115 ; *Home Fire Ins. Co.* v. *Bean* (Neb.) 60 N. W. Rep., 907 ; *Queen Ins. Co.* v. *Leslie,* 47 Ohio St., 409 (24 N. E. Rep., 1072) ; *Reilly* v. *Franklin Ins. Co.,* 43 Wis., 449 ; *Bummessel* v. *Ins. Co.,* 43 Wis., 463 ; *Thompson* v. *Citizens' Ins. Co.,* 45 Wis., 388 ; *Cayon* v. *Dwelling House Ins. Co.,* 68 Wis., 515 ; *Seyk* v. *Millers Nat. Ins. Co.,* 71 Wis., 67 (41 N. W. Rep., 443) ; *Oshkosh Gaslight Co.* v. *Germania Fire Ins., Co.,* 71 Wis., 454.

He further says : "Under such statutes, if several policies are issued upon the same property, the full amount of each may be recovered. Besides the principal case, the following sustain this proposition : *Reilly* v. *Franklin Ins. Co.,* 43 Wis., 449 ; *Cayon* v. *Dwelling House Ins. Co.* (68 Wis., 515) ; *Oshkosh Gaslight Co.* v. *Germania Fire Ins. Co.,* 71 Wis., 454 ; *Barnard* v. *National Fire Ins. Co.,* 38 Mo. App., 106 ; *Queen Ins. Co.* v. *Jefferson Ice Co.,* 64 Texas, 578. Accepting a policy which prescribed a different rule for fixing the amount of the loss to be paid does not constitute a waiver of the statute or exclude its operation. *Queen Ins. Co.* v. *Leslie,* 47 Ohio St., 409 (24 N. E. Rep., 1072) ; *Dugger* v. *Merchants & Traders Ins. Co.,* post. In *Thompson* v. *Citizens Ins. Co.,* 45 Wis., 388, it was held that submitting the amount of the loss

to arbitration in accordance with a provision of the policy did not amount to a waiver of the benefit of the statute."

In the case of *Dugger et al.* v. *Mechanics' & Traders' Insurance Company of New Orleans* (supreme court of Tennessee, June 22, 1895), 95 Tenn., page 245, s.c. 32 S. W. Rep., 5, the policy under consideration provided: "It is a part of the consideration of this policy and the basis upon which the rate of premium is fixed, that in the event of loss this company shall not be liable for an amount greater than three-fourths of the actual cash value of the property covered by this policy at the time of such loss; and in case of other insurance, whether policies are concurrent or not, then for its prorated proportion of such three-fourths value."

The insurance company insisted that this provision was valid, and that it was only liable thereunder for three-fourths of the loss, and tendered that amount with its answer.

The assured insisted that this provision was void, because in violation of the act of the general assembly of Tennessee, passed in 1893, which is as follows: "*Be it enacted by the general assembly of the state of Tennessee,* That insurance companies shall pay their policy holders the full amount of loss sustained upon property insured by them; provided, said amount of loss did not exceed the amount of insurance expressed in the policy. All stipulations in such policy to the contrary are, and shall be, null and void."

The court sustained the claim of complainant and held the insurance company liable for the full amount of the loss. The opinion concludes as follows: "Lastly, it is insisted that the acceptance of the policy by the assured with this stipulation was a waiver of the benefit of this statute, which at most conferred only a personal privilege. This is erroneous. In the first place, the statute in express terms makes the stipulation in question "null and void." This statutory provision annuls this obnoxious agreement, and in legal effect it is as much a part of the policy as if written into its face. *Emery* v. *Ins.*

*Co.,* supra.   In the second place, it was said in *Ins. Co.* v.
*Leslie,* supra: 'The statute cannot be regarded as conferring
on the assured a mere personal privilege, which may be waived
by agreement.   It molds the obligation of the contract into
conformity with its provisions, and establishes the rule and
measure of the insurer's liability.'   The opinion of Judge
Brewer in *Wall* v. *Assurance Society,* supra, and that of Judge
Dillon, in *White* v. *Ins. Co.,* will be found in harmony with the
above.   The result is, we affirm the chancellor in maintaining
the constitutionality of this act."

In the more recent case of *Hickerson* v. *German-American
Insurance Company* (supreme court of Tennessee, February,
1896), 33 S. W., 1041, the court again held: "The three-
fourths value clause in the policy of fire insurance is inopera-
tive under act of 1893, chapter 107, section 1, which provides
for the recovery for the full amount of the policy."

We submit that these decisions construing statutes prac-
tically like the one in force in this state, establish beyond con-
troversy, first, that no deduction can be made from the
amount of the policy on account of concurrent insurance, as-
sented to by the insurer, and, to use the language of the su-
preme court of Missouri, "The amount written in each policy
is expressly assented to by all the insurers, and they must
be held to agree that the aggregate of their several policies
is the value of the property.   To hold otherwise is to repeal
the statute in every case where there is more than one policy
on the same property, whereas it was intended to apply to all."
Second, that the stipulations of the policy must yield to the
statute.   The statute enters into and forms a part of the
contract of insurance as completely as if written into it; and,
finally, that under the valued policy act of the state of Missis-
sippi, an insurance company cannot investigate and tender
the value of the property in case of total loss, by any attempt
to insert the three-quarter or other clauses of similar char-
acter, in their policies, and thus avoid liability for the full

amount of the policy. And for these reasons we think the pleas are untenable, as will be seen by a most cursory examination.

By the second plea the insurance company sought a forfeiture of the policy because, as it alleges, the plaintiff insured said property for more than three-fourths of the cash value of the same. Such a defense, if sustainable, would repeal the statute.

The third plea seeks to derive some benefit from the concurrent insurance, which, as we have shown, cannot be done. It is also objectionable because, while it pretends to be a defense to the entire action, it admits a liability for one-half of three-fourths of the actual loss.

The sixth plea is in effect of the same character as the second.

The seventh, twelfth, and thirteenth pleas are subject to the same objection as the third.

The fourth plea seeks to defeat the action on account of other insurance without the consent of the defendant, but the plea omits the essential allegation that such consent was necessary, and of course the plea must stand or fall upon its own averments.

After the court had sustained these demurrers, the only issues remaining to be submitted to the jury, arose upon the general issue, the fifth, eighth, ninth, tenth, and eleventh pleas.

The fifth and eighth pleas presented the question of concurrent insurance without the permission of the insurance company.

To the fifth plea plaintiff replied, denying there was any other insurance on said property, and, as the demurrer was sustained to the second replication to the said fifth plea, the plaintiff filed an amended replication, stating, in substance, that said additional insurance was placed with the knowledge and consent of the said defendant, both by writing indorsed on the

face of the policy sued on and with the knowledge of and consent orally given by said defendant.

The court will observe that neither the eighth plea nor the fifth plea referred in any manner to the character of the other insurance, whether it was valid or not, simply referring to "other insurance." The provisions of the policy were more stringent than the averments of the pleas, as the former prohibited any insurance, whether valid or not, but for some reason or other the insurance company omitted to avail itself of the phraseology of the policy.

To the eighth plea the plaintiff replied, denying, first, that there was any other policy of insurance upon said property, and, second, averring that defendant consented to the said other insurance, and subsequently filed an additional replication to the fifth and eighth pleas, charging that the said insurance company had waived the provisions of the policy referred to in said pleas, relating to other insurance, and is estopped to insist upon the forfeiture of the policy on account of any violation thereof.

The ninth plea related to the use of artificial lights, the tenth plea to the operation or repair of machinery after night, and the eleventh to the use of an iron-bound barrel and metal buckets.

The plaintiff by other replications denied any violation of the policy in these respects, and also set up a waiver of all these provisions of the policy.

These pleas were affirmative defenses. The burden rested upon defendant to prove them, and they were practically abandoned at the trial, for there was no evidence introduced to sustain them.

The only issues, therefore, left for the jury to pass on related entirely to "other insurance," and were presented by the fifth and eighth pleas and the replications thereto.

Under these pleas, which were, of course, affirmative, it was, we submit, incumbent upon the insurance company to show that there was other valid insurance upon the property. In-

dependently of any other question, if there was other insurance upon the property which was invalid or void, under the terms of the plea, the policy was not forfeited. Other insurance must be valid, legal, and enforceable insurance, otherwise it is not insurance at all. It was to avoid the effect of any construction of the term, "other insurance," which might be adverse to the policy framers that induced the insurance companies to incorporate in their policies the term, "whether valid or not." As we have shown, the pleas did not use the language of the policy, and of course their validity must be determined by their own phraseology.

To prove the existence of this other insurance, the insurance company mainly relied upon the testimony of their own witness, R. C. Wilkerson, and we submit that his testimony not only fails to show that there was any other valid insurance on this property, but, on the contrary, we find that he was insisting vigorously that his policy was invalid, and so notified Dr. Phelps after the fire.

But in view of the overwhelming fact in this case that this additional insurance was consented to by the insurance company, and that it, with full knowledge of the existence of this other insurance, accepted the premium from this plaintiff, any discussion of the technical effect of these pleas seems to be idle, and with all due respect we think we can be permitted to say that the conduct of the appellant is utterly without justification.

·  *The merits.*—It seems to us that this appellant is not only oblivious of the rights of this patron and policy holder, the appellee, but profoundly indifferent to any of the enunciations of this or any other of the leading courts of the United States. How is it possible that on the eve of the nineteenth century, with the law keeping step with civilization, and responding with alacrity and skill to the expanding needs of society, and with the world—at least, the cultured world—dominated by

a spirit of justice and equity, an insurance company can, in any temple of the law, annul its own contract while enjoying the fruits thereof? How can it appear before any tribunal, and, while unblushingly admitting that it has the price of its policy in its exchequer, insist that its policy is valueless because of a violation of a condition therein known to it when the price was paid?

Does it not know that this court, in *Mitchell* v. *Mississippi Home Insurance Company,* 72 Miss., 53, formulated and promulgated the following enlightened doctrine: "The insurer cannot be permitted to collect premiums with the full knowledge of the existence of facts which might void the policy, and with full knowledge of the insured's purpose to continue, in disregard of the provision working a forfeiture, to conduct the business as theretofore in such disregard. We cannot legalize by our sanction such perfidy."

Indeed, the Mississippi decisions have been uniform on this subject, and so far from restricting the principle, the courts have apparently extended it with each succeeding adjudication. The facts in this case give greater sanction to the application of the doctrine of estoppel than in some of the cases where it has been invoked. Here we have an insurance company whose agent already held a policy of insurance upon the property insured, who was so fearful he would lose a good customer on account of the absence of the husband of the assured that he issued a policy eighteen days in advance of the expiration of the insurance then in force, and on the return of said husband, still anxious to avoid the loss of patronage, adopted the rather remarkable course of making a trip from Vicksburg to Nitta Yuma to deliver the policy in person. At the time of said delivery he had full notice, according to his own sworn testimony, of the existence of the concurrent insurance, and he delivered the policy with that knowledge, and the same was duly accepted by the assured.

Unfortunately, within a few days after the delivery and acceptance of the policy the property was destroyed, and then, like an honest man, he did what it was his duty to have done at the time the policy was delivered—indorsed permission for other insurance upon the policy. This indorsement was, of course, absolutely unnecessary. His knowledge of the other insurance was the knowledge of his company, and the acceptance of the premium with that knowledge bound the company.

All this pretense of virtue on the part of the insurance company is ungrateful. Mr. Klein did nothing that was wrong in law or in morals, but, on the contrary, he did that which was absolutely and unquestionably right. So far from being the subject of the hostility of his company, he should have received its unqualified praise.

It is difficult to conceive of a case where more glaring wrong has been perpetrated by an insurance company. This company was not only bound by the knowledge and act of Mr. Klein, but the fact of this other insurance was known to it through the knowledge of its other representatives. It must have been known to its special adjuster, Capt. L. M. Tucker, who visited the scene of the fire for the purpose of making an adjustment. It was known to it when it received the proof of loss, which on its face conveyed the information of other insurance, and the receipt of which it acknowledged. It was known to its general manager at Atlanta, Mr. Dexter, who is, of course, to all intents and purposes, the company itself, and he never claimed any forfeiture of his policy, but admitted liability thereunder, and sought to defy the laws of this state, by insisting upon certain conditions in his policy which were in violation of the law, and by demanding a reduction in the amount claimed, and doing all this with the premium of the policy holder in his, or his company's, possession.

Here, then, we have a case of the most aggravated character —a policy holder compelled to incur the expense, delay, and

annoyance óf litigation with the insurance company, knowing that she has been wronged, defending and seeking to perpetuate said wrong with the money of its confiding patron in its pockets.

This court has never hesitated to repair such wrongs. The first leading case upon the question here involved is *Rivara* v. *Queen Insurance Co.,* 62 Miss., 720, decided in 1885. The court, on page 728, says: "An insurance agent clothed with authority to make contracts of insurance or to issue policies, stands in the stead of the company to the assured, and his acts and declarations in reference to such business are the acts and declarations of the company. The company is bound not only by notice to such agent but by anything said or done by him in reference to a contract or risk, either before or after the contract or risk," citing Wood on Fire Insurance Companies, 641, 648, 650, 651; 1 Phillips on Insurance, sec. 562.

Finally the court said, on page 729: "If the assured has been guilty of no fraud, the insurer is estopped from setting up a breach in conditions of the policy, when it knew at the time the policy was issued, that the condition was inconsistent with the facts, or a breach of any condition after the policy was issued, if it has induced the insured to believe that such breach was waived and has thereby misled him."

The next case is that of *Phenix Insurance Co.* v. *Bowdre,* 67 Miss., 620: "The court reaffirms the doctrine of *Rivara* v. *Insurance Co.* 62 Miss.; supra, and refers to the language above quoted relative to the powers of the agent."

In this case it appears that after the fire the plaintiff went to the agent who issued the policy, and this agent told him that it was not necessary to have a builder's estimate, required by the policy. The agent testified that it was expressly understood that the plaintiff would not let the fact be known that he, the agent, had aided him in preparing the proofs of loss. The court found, on page 642, "that the agent had the power

to waive the builder's estimate, although he was not an adjuster, and the court supported the finding of the jury in that respect."

In the case of *Liverpool, etc.. Ins. Co.* v. *Sheffy,* 71 Miss., 919, the court again said: "The power of one who receives applications, issues policies, collects premiums, and otherwise acts as a general agent to make a contract of insurance involves the power to modify the same by a subsequent agreement as to additional insurance on the same property."

The court held that the clause against additional insurance might be waived by such an agent, and quoted approvingly the following quotation from Flanders on Fire Insurance, pages 47, 51, 56 and 57: "Where, however, the underwriter has notice of the additional insurance, and although not formally giving his assent thereto, yet by his acts, such as collecting assessments, treats the policy as in full force, it will be a waiver of the right to resist a recovery upon that ground," and this quotation, thus approved and sustained by the supreme court, is exactly in point and should be decisive of this case.

In the case of *Mitchell* v. *Mississippi Home Insurance Co.,* 72 Miss., 53, the court said: "An insurance company cannot set up a breach of such iron safe clause where its agent, when he issued the policy, collected the premium, knew that the insured had no safe and did not intend to have one, but intended to keep the books of account at the store, as he had been doing."

The court in its opinion said, on page 57: "To ask us to hold that an insurance company shall ostensibly contract for keeping an inventory and books of account in an iron safe, or at some secure place apart from the premises on which the property insured is kept, and yet, with full knowledge that the insured had, and intended to have, no safe, and with full knowledge that such inventory and book of account had been kept, and were to be continued to be kept, at the store, to

receive the insured's premiums as for a valid policy, the company intending to deny its validity if loss should occur, is to ask us to sanction trickery and fraud. The insured cannot be permitted to collect premiums with the full knowledge of the existence of facts which might avoid the policy, and with full knowledge of the insured's purpose to continue, in disregard of a provision working a forfeiture, to conduct the business as theretofore in such disregard. We cannot legalize by our sanction such perfidy," citing *Rivara* v. *Insurance Co.,* supra.

*Home Insurance Co. of New York* v. *J. Gibson,* 72 Miss., 58: "Where the agent of an insurance company receives a premium and issues a policy on the building, knowing that the assured has only a leasehold interest, the policy is good, notwithstanding stipulations therein that it shall be void in the interest of the assured by other than the sole, unconditional ownership, and that no representative of the company is authorized to waive conditions except those mentioned, and then only by writing indorsed on or attached to the policy."

*Insurance Co.* v. *First National Bank,* 73 Miss., 469. On page 470 the court said: "Whatever may be the rule elsewhere, it is settled in this state that the clause in policies of insurance limiting the powers of officers or agents of the insurance companies to waive breaches of the conditions of the policy, except in a certain manner, is inoperative, where the waiver has been made other than that specified in the policy," citing 67 Miss., 620; 71 Miss., 919, supra, and 72 Miss., supra. "If with the knowledge of the breach of this condition by the agent, the insurance company, through the agent, requested and made a change in the form attached, and then returned the policy as one of binding obligation to the bank, the insurance company cannot now complain of such breach of that condition."

On page 63 the court says: "This is true relative to any agreement waiving the provisions of the policy, as well of the

provisions which relate to the confirmation and binding force of the contract while running as to those provisions relating to what has to be done after the loss," citing 11 Am. & Eng. Enc. L., page 342, note 1; page 338, paragraph 4 and note 2; page 339.

If this court stood alone its conclusions would be unassailable, but its views are in harmony with the adjudications of the most enlightened tribunals in the land. "It is the general rule that acceptance of the premium after full knowledge of the violation of the policy, is a waiver of any forfeiture from such violation." May on Insurance, § 362. "Accepting an assessment or payment of a premium after knowledge of some infirmity in respect to the policy, acquired subsequent to its delivery, constitutes estoppel." 11 Am. & Eng. Enc. L., page 340. "If the insurer, with full knowledge of facts that would void the policy, notwithstanding executes and delivers, or if after its delivery, they acquire knowledge of such facts and subsequently treat it as valid and binding, by any acts, words or conduct that might reasonably lead the insured to believe himself to be still insured, they will have waived the defect and be estopped to assail it." 11 Am. & Eng. Enc. L., page 337.

Numerous authorities are cited to sustain the text in both instances.

In the case of *Titus* v. *Glens Falls Insurance Co.,* 81 N. Y., 410, the court announced the rule thus: "But it may be asserted that if in any negotiations or transaction with the assured after the knowledge of the forfeiture, it recognizes the condition valid of the policy or its acts based thereon, or requires the insured, by virtue thereof, to do some act or incur some trouble or expense, the forfeiture is, as a matter of law, waived."

The supreme court of Indiana, October 18, 1891, in *Continental Insurance Co. of New York* v. *Chew,* 38 N. E., 417,

holds: "Acceptance of a premium by an insurance company after knowledge of the loss, occurring while the premium was in default, waives the forfeiture, and does not merely revive the policy as to the future."

The supreme court of Michigan as late as May 28, 1897, in *Douvill* v. *Farmers' Mutual Fire Insurance Co. of Saginaw County*, 71 N. W., 517, seems even to extend the rule, for it holds: "An insurer who before suit brought, disclaimed all liability solely on the ground that the policy was canceled at the time of the loss, will be estopped to claim that the loss should be adjusted by arbitration under the provisions of the policy, or that he is not liable by reason of there being an incumbrance on the property, or that the premises did not belong to the plaintiff."

The court said: "It is claimed on the part of the plaintiff that the only defense which can be urged by the company is that prior to the loss the policy had been canceled, and as that is the only reason that the plaintiff gave to the counsel before suit was brought, why the loss was not paid, upon the ground of waiver and estoppel, it is now precluded from taking any other position."

The court, after quoting from Herman on Estoppel, sections 1011, 1012; *O'Brien* v. *Ins. Co.*, 52 Mich., 131 (17 N. W., 726); *Towle* v. *Ins. Co.*, 91 Mich., 219 (51 N. W., 987); *Lum* v. *Ins. Co.*, 104 Mich., 399 (62 N. W., 562), announces this conclusion: "As was said in *Towle* v. *Ins. Co.*, when the defendant was asked to adjust this loss, good faith required that the company should apprise plaintiff fully of its position, and, failing to do this, it estops itself from asserting any defense other than that brought to the notice of the plaintiff. We think the only question open to it is whether or not the policy had been canceled at the time of the fire."

If this insurance company has not waived all of its defenses in this case which were submitted to the jury, then it seems

to us almost impossible to imagine a case of this character wherein a waiver can be upheld.

In the first trial some question was raised concerning the absolute destruction of the property. The evidence of Mr. Harry Phelps showed that the property was totally destroyed. The defendant undertook, by one of their witnesses, to maintain that the boiler and engine had some value. While this question is now eliminated by agreement from the consideration of the court, and the case must be treated as if the property was entirely destroyed, we respectfully submit that, even taking the testimony of defendant's witness to be true, a total recovery should have been allowed.

In the case of *Havens* v. *Germania Fire Ins. Co.*, supra, this question was also presented, and the court undertook to define the "meaning and construction of the words, 'wholly destroyed,' in the valued policy act." It held: "Where at the time of the burning of the mill, part of the machinery covered by the insurance policy is in another building, having been removed to facilitate improvements, the mere fact that such machinery was not destroyed will not render the loss a partial one, but the value thereof will be deducted from the amount of the policy."

Among other things, the court said: "The property insured was a mill, and the fire destroyed its identity and its specific character as such, and words 'wholly destroyed' have been placed in statutes like this in many states of the union, and so far as we have been able to find, the construction appears to be uniform that, as applied to buildings, they mean totally destroyed as a building, although there is not an absolute extinction of all its parts. It matters not that some *debris* remains which may be useful or valuable for some purpose," citing quite a number of decisions.

Words of a like statute have been similarly construed in *Seek* v. *National Ins. Co.*, 76 Wis., 68; *Barnard* v. *Mutual Fire Ins. Co.*, 38 Mo., p. 106.

In the case at bar what was insured as a whole was the gin house, and its machinery, and it seems to be against reason that after the total destruction of everything that could be consumed by fire, with the boiler and engine seriously damaged, and the gin house, of which it was a part and parcel, absolutely gone, the loss could be considered a partial one under the statute.

We submit that the sound rule would be, in cases of this sort, to make the insurance company pay the amount of the policy, and if there is any property remaining in a damaged condition, the insurance company should be permitted to claim it. But, as stated, this court is no longer concerned with this question.

*The motion for a new trial, and the act of the court in granting the same.*—If the foregoing views are correct, the defendant is absolutely without standing in court, and by its own acts is now estopped from denying liability under the policy.

On the evidence as it then stood, the court should have granted a peremptory instruction, and therefore there could be no error in correcting this mistake by setting aside the first verdict and judgment and granting a new trial and a peremptory instruction, but with the admission that the loss was total, there was no question left for the jury to determine. The defendant, however, having excepted to the action of the court in granting a new trial, which involves the validity of the proceedings on the second trial, we will proceed to consider this exception.

The court did not indicate upon what ground the peremptory instruction was granted to the defendant in the first trial, but we infer from the action of the court and the arguments of counsel that it was based upon the assumption that Mr. Klein's testimony indicated that the policy had never been actually delivered.

It is difficult now to conceive on what the defendant could have even then relied to support such a contention, even if we

ignore the rule of law that the defendant could not deny the execution of the policy while in possession of the premium.

When the policy was introduced in evidence, the defendant did not object for the reason that there was no contract, but (1) as to that part of the policy, "other insurance permitted, $2,845," and (2) that it is not shown that the indorsement above referred to was put on the policy at the time it was made, and the indorsement is not dated. From this very objection the court will observe that defendants recognized the policy as an existing obligation at the time it was issued.

Again, in the cross-examination by defendant's attorney of Mr. Phelps there is another distinct recognition of the validity of this policy. Mr. Phelps was asked this question:

"*Ques.* Look at that policy and see as to whether that policy began on the 21st day of September, 1896.

"*Ans.* It appears to me that this was a renewal of the policy we had.

"*Q.* What I want to know is as to when it commenced—that policy you have there.

"*A.* At noon of the 21st of September.

"*Q.* Of what year?

"*A.* 1896.

"*Q.* And the fire occurred the next day?

"*A.* Yes, sir.

"*Q.* That was in September?

"*A.* Yes, sir.

"*Q.* On the 22d?

"*A.* No, sir; the fire occurred between the evening of the 21st and the morning of the 22d.

"*Q.* Well, we agree about this, the policy and the fire, that the policy went into effect on the 21st, and the fire occurred on the 22d day of September, 1896?

"*A.* Yes, sir, as far as I know."

Here is an explicit admission by the defendant on the record that this policy went into effect on the 21st of September.

Again, still on cross-examination, Phelps was asked:

"*Ques.* What I meant to ask you was that Phelps reserved the right to sanction and control the affairs there?

"*Ans.* Yes, sir, and to recognize, which he did, the Western Insurance Company policy, with whom he was insuring."

There is a clear statement, brought out on cross-examination by the defendant, that Phelps recognized the Western Assurance Company policy.

On page 69 appears the following letter from Phelps to Mr. Wilkerson, which he received the Sunday night before the fire: "Your recent favor has arrived regarding my insurance. I am much pressed with matters of business. My son has not been fully advised regarding my arrangements for insurance. He appears to have requested some additional insurance, which has been placed with you, I presume in good, prompt-paying companies, which I am disposed to let rest, but I have no idea of disturbing the policies yet in force. I leave in haste."

Owens testified that the books showed the following indorsement: "Vicksburg, Miss., Agency Western Assurance Company, policy number 1,284,396, renewal, amount insured, $2,845, indorsement dated September 23d, 1896, present rate seven, expires September 21, 1897, name of assured, M. B. Phelps, other insurance permitted, $2,845. Received December 15, 1896, George J. Dexter, Manager. Signed, Klein & Dickson."

Mr. Dickson, witness for defendant, says:

"*Ques.* You remember anything about a policy of insurance issued by your firm for Mrs. Phelps on some property up here at Nitta Yuma?

"*A.* Yes, sir.

"*Q.* Did you have any other policy, except this, about that date on this property?

"*A.* No, sir; that is the only policy we had on the Phelps' gin.

"*Q.* Examine the property in the face of that policy, and state if the Western Assurance Company had any other policy except that one.

"*A.* No, sir, not on that gin; nothing else.

"*Q.* Examine that book you have there, and state to the jury what it is.

"*A.* This is Klein & Dickson's register of the Western Assurance Company, at the time we represented the company in the office.

"*Q.* Turn to this policy; the date of the policy?

"*A.* The 21st day of September.

"*Q.* It runs from what time?

"*A.* It is an annual term—from September 21st 1896, to September 21st, 1897."

On cross-examination he says:

"*Ques.* Your firm had a policy on this property prior to the beginning of this policy?

"*A.* Yes, sir; this was a renewal of exactly the same policy that we had the year previous. The policy that this was a renewal of, however, was in the British American—that is, the policy that expired before this one went into effect.

"*Q.* What was the difference between the British American and the Western Assurance Company?

"*A.* Both were under the same management in Atlanta, but two different companies. Being under the same management, when one company went out, the other came in to take care of the business."

Klein testified, as we have shown, that he delivered the policy with full knowledge of the existence of the other policy, and that Dr. Phelps for his wife accepted it.

On cross-examination, he testified:

"*Ques.* You say that you had notice of the insurance on the part of the Phœnix, of London. State what occurred between you and Dr. Phelps about this on Saturday—the conversation that took place.

"*A.* I can't state the exact conversation, as it has been over a year and a half ago. I can tell about what occurred.

"*Q.* Give us, then, your best recollection.

"*A.* Of course, I can't say the words; but the general idea was that he had this other insurance policy.

"*Q.* That is, the Phœnix, of London?

"*A.* Yes, sir.

"*Q.* Well?

"*A.* And he showed it to me, and I gave him that policy, and my impression is—I don't remember whether he said so— my impression was that Dr. Phelps probably thought that both were more insurance that he needed, and he made an appointment for me to come there the following Thursday and revise his insurance.

"*Q.* What was the agreement between you?

"*A.* We had no agreement, except that I was to go back there.

"*Q.* Didn't Dr. Phelps tell you that he was going to surrender one of these policies—that is, the Phœnix, of London, and make some changes in the policy you left there?

"*A.* No, sir; he did not tell me that.

"*Q.* Why was it he wanted you to come back there on Thursday?

"*A.* As I just stated, to revise his insurance—all of his insurance; not only of this insurance, but wanted to get it all straightened out.

"*Q.* What do you mean?

"*A.* To get it straightened out correctly if there was anything wrong about it.

"*Q*. Correct in what respect? Did you understand that he was going to surrender either one of those policies?

"*A*. I believe I stated that he expected to revise those policies.

"*Q*. What do you mean by your impression, your best recollection?

"*A*. That is what he said.

"*Q*. And you mean by impression your best recollection?

"*A*. I suppose so.

"*Q*. That he was going to revise the policies in what respect?

"*A*. He did not say; that was only my own idea.

"*Q*. Was that all that occurred between you and Phelps about it?

"*A*. How do you mean, sir?

"*Q*. You just came away from there, leaving the policies?

"*A*. Yes, sir, expecting to go back next Thursday.

"*Q*. Did I understand you to say, either in answer to a question of Mr. Hirsh or myself, that Phelps made any statement about the amount of insurance being larger than usual— the amount that he then had?

"*A*. No, sir; he did not state that."

On redirect examination, he says:

"*Ques*. You went on to explain about other insurance, and revise insurance; what did you mean about that?

"*A*. I got that impression from Phelps, that he wanted to revise his insurance.

"*Q*. What other insurance did he have?

"*A*. Considerable insurance on his stock of goods up there, and on his houses, all running out about the same time.

"*Q*. When was the policy to take effect, according to its terms?

"*A*. The 21st of September, 1896."

All the foregoing testimony establishes conclusively that

there was no question about the execution and delivery of the policy until the defendants thought they had discovered a mare's nest in something that Klein said. We have the distinct admission of counsel that the policy went into effect; we have the extract from the register showing that the policy was in effect, and that it was simply a renewal of another policy, in a different company, it is true, but under the same management; we have Helion Dickson's explicit declaration that the policy was issued, and we have Klein's own statement that the policy was not only delivered, but accepted.

It is evident that the defendants are mistaken about Klein's testimony on cross-examination. Klein expressly stated that he could not state the exact conversation that occurred between him and Phelps. All this was brought out by the defendant. In answering the question, Klein expressly stated that his own impression was, but he could not remember whether Phelps said so, that Phelps thought he had more insurance than he needed, and he made an appointment for him to go there on the following Thursday and revise his insurance.

Analyzing this answer, it is clear that the witness would not swear that even Phelps told him anything which produced his impression, and all that it really shows is that Phelps made an appointment with him to go there on the following Thursday and revise his insurance; but there is not a syllable of testimony showing that he did not regard his insurance as in force, and if he was going to have his insurance revised he could only revise something that was in existence. He certainly could not revise insurance that he did not have, and the term "revise his insurance" necessarily means the insurance that he was carrying, and necessarily also that until he did revise it, it was his insurance—that is, insurance existing and valid.

He is asked, "What was the agreement between you?" and

answers: "We had no agreement, except that I was to go back there." It is perfectly clear from this that the witness did not intend to say anything more than that there was no agreement with Dr. Phelps regarding the revising of his insurance, further than that he was to go back there. The witness did not say, and this language could not be tortured into saying there was no insurance in force, and the witness had already testified that he had delivered the policy and it had been accepted.

It seems absurd to talk about a verbal agreement relative to this policy of insurance, when the policy itself, which was delivered and accepted, contains all the agreements that could possibly be proved. No verbal agreement could affect the policy, and it, as the witness expressly stated, according to its own terms, took effect on the 21st of September, 1896, and he never qualified this assertion.

All this talk about agreement refers to the revision of the insurance, and not to the agreement to take this insurance policy, because that was already delivered and accepted. And the defendant, the more it pressed the matter, the less it discovered, for when its counsel asked him, "Didn't Phelps tell you he was going to surrender one of these policies—make some changes in the policies you left there?" he answers most positively: "No, sir; he did not tell me that."

Then, to emphasize what he had already said, in response to a question as to "what he wanted to go back for on Thursday," the witness said: "As I just stated, to revise his insurance, all of his insurance; not only this insurance, but wanted to get it all straightened out—that is, get it straightened out correctly if there was anything wrong about it."

"*Ques.* He was going to revise his policies in what respect?

"*Ans.* He did not say; that was only my own idea."

Then, desiring to have it more explicit, defendant asked him:

"*Ques.* Was that all that occurred between you and Phelps about it?" and the witness, not understanding the question,

never answered it, but, on the contrary, propounded a question in answer: "How do you mean, sir?"

"*Ques.* You just came away from there, leaving the policies?

"*Ans.* Yes, sir, expecting to go back next Thursday."

It is perfectly clear, we think, that Klein, who already had his insurance in force on this property, and who had been insuring Phelps for years, was determined not to be anticipated by Wilkerson, so he carried his policy up there and delivered it, and the same was accepted by Phelps. As there had been some complication on account of an act of his son, Harry, with reference to insurance, it was evident that Phelps wanted to have his entire insurance revised, and invited Klein to come back there for that purpose—at least, that is Klein's impression, although he would not state distinctly what Phelps said.

There was no agreement between him and Phelps as to how and in what manner the insurance was to be revised, and that term "agreement" applied solely, as we have already stated, to a revision of the insurance, and not to this policy. Klein most distinctly says a revision of all of his insurance, and it seems to us preposterous to say that because a man wants to revise his insurance at some future day that an expression of such desire is equivalent to admitting that he has no present insurance, and therefore no insurance to revise. On the contrary, it seems beyond question that the fact that he wants it revised indicates that he had got insurance to revise.

Besides, the policy itself is the agreement, and on its face it recites in consideration of a certain premium it is to take effect, and the reception of the premium by the company, which is undisputed, and its retention by the company, which is undisputed, in view of all the authorities and the common principles of morality, establishes the existence of the contract even

if it was otherwise open to assailment.    The defendant could not deny the agreement and retain the consideration.

It is possible the defendant was under the impression, shared by the court, that the plea of *non assumpsit* raised the question of the execution of the policy.    That is clearly an error. It has been a law of this state for many years, and is now incorporated in § 1797 of the annotated code of 1892, that "in suits founded on any written instrument set forth in the pleadings it shall not be necessary to prove the signature or execution thereof, unless the same be specially denied by plea verified by the oath of the party pleading the same."

And further: "It shall not be necessary in any case to prove the execution of any instrument which may be set forth in the pleadings, unless the same be specially denied by plea, verified by oath."

A failure, therefore, to plead *non est factum* or any plea under oath denying execution of an instrument, necessarily made the mere introduction of the instrument prove its execution, and its own contents, and no proof would be permissible tending to show that it was not executed without a sworn plea. The failure to plead under oath admits the validity of the contract.

Gen. George, in his digest, on page 539, reviewing our statute relative to pleadings under oath, quoting the sections in the Hutchinson code, stated "that these provisions are substantially incorporated in the revised code of 1857," and the provisions in the revised code of 1857 are identically the same as in the annotated code of 1892.

Among the decisions contained in his digest are the following:

"But a plea of nonassumpsit merely, though sworn to, will not do, and either the plea or an affidavit in support of it should contain the direct denial of the signature or the execution of the note."    Further: "Pleading in chief admits the execution of

the note sued on," citing *Greene* v. *Robertson,* 3 Howard, 105; *Anderson* v. *Tarpley,* 6 Smed. & M., 507.

The supreme court of Massachusetts held: "Insurer cannot rely on misrepresentation to defeat action, unless it is specified as a ground of defense in the answer, nothwithstanding it is first disclosed by the evidence of the insured." *Hoskins* v. *Hamilton Mutual Insurance Co.,* 5 Gray, 432.

Even if there had been no policy delivered, and there had simply been an agreement between Klein and Phelps to insure this property, a recovery could be had.

Mr. Wood in his work on Fire Insurance, vol. 1, page 13, says: "Parol agreement to insure is valid and binding when all the essential elements of a contract have been agreed upon and the minds of the parties have met," citing 22 Ind., 73.

In *N. E. Fire & Marine Ins. Co.* v. *Robertson,* 25 Ind., 536, cited on same page, the plaintiff made an application to the agent of a foreign insurance company to insure a building against fire. The proposition was accepted by the company, and parol contract was thereupon made with the agent for an insurance of $1,000 for one year, and it was also agreed with the agent that the policy was to be delivered when called for, and the premium was to be paid in five days. Before the expiration of that time, and before the payment of the premium, the building was destroyed by fire. The plaintiff thereupon tendered the premium and demanded the policy, which was refused. The court held: "That under this state of facts the insurance was complete and binding and that the policy was not essential as the foundation of an action, and the plaintiff was not obliged to allege or show a compliance with the conditions as the refusal of the company to issue a policy on demand was a waiver of the conditions precedent.

Mr. May in his work on Insurance, sec. 45, says: "It being settled that insurers may now become liable for loss, although they may not have issued a policy, the question often arises when that liability is fixed. Thus in *Kohne* v. *Insurance Co.*

*of North America* plaintiff's agent applied for insurance and agreed upon all the terms, but left the office before the policy was filled out. This, however, was filled out within a few hours, and notice thereof given by the company, accompanied, however, by notice that the company had received information that a loss had happened. He called for the policy and tendered the premium. The agent was refused, on the ground that the loss had happened before the delivery, and the contract was not complete. But the court held otherwise, as everything had been agreed on, and nothing remained to be done but to carry out the terms already agreed on, and the plaintiff had a verdict."

· In section 45 (a) entitled "Policy executed after loss," Mr. May goes on to cite a case which referred to a policy issued after loss, and says: "And the question was whether such a policy, so executed after knowledge on the part of both parties of the loss, could be upheld. Upon this point the court had no doubt."

We therefore respectfully submit that this case should be affirmed.

Whitfield, C. J., delivered the opinion of the court.

The contentions that the appellant, if the only insurer, would be liable for only three-quarters of the loss, under the three-quarter clause in the policy; and in case of valid concurrent insurance consented to, for the same amount appellant insured for, then, for only one-half of three-quarters of the loss, cannot be upheld, since this policy was issued after the adoption of our "valued policy statute" (Laws of 1896, chapter 56), which statute is therefore integrated into, and made part of, the policy, and hence necessarily writes out of the policy all stipulations therein in conflict with the statute. As said by Judge Dillon in *White* v. *Insurance Co.,* 4 Dillon, 177, approved in *Havens* v. *Germania Fire Insurance Co.,* 123 Mo., 403, s.c. 26 L. R. A., 107, s.c. 27 S. W. Rep., 718, "the gen-

eral rule is that laws in existence are necessarily referred to in all contracts made under such laws, and that no contract can change a law.   The provisions of said act of 1896 are substantially identical with similar statutes in Missouri, Tennessee, and elsewhere, and we find an unbroken line of decisions construing these statutes.

Since, however, counsel for appellant do not seriously controvert here the propositions of counsel for appellee on the construction of this statute, and especially in view of the accurate and discriminating marshaling of the authorities by the counsel for appellee in their very able brief in this cause, we shall state the conclusions at which we have arrived on this head, with some of the authorities, referring the bar to that brief, which we direct the reporter to print in full, for a full list of the authorities, and the discussion of them.

We think it clear, under the act of 1896, supra:

1.   That the three-quarter clause is nugatory.   An insurance company must determine the valuation of the property. It can then insure such part of that valuation as the parties may agree on, but whatever amount it does insure, receiving premiums on that amount, is the final measure of its liability in case of a total loss, and it cannot reduce this amount by inserting in the policy provisions seeking to impose upon the insured the burden of co-insurer.   The amount named in the policy, and on which amount the insured pays premiums, is practically liquidated damages in case of a total loss.   There is nothing harsh about this law.   It was manifestly enacted to meet and remedy a thoroughly well-known evil, and it is as perfectly a part of the contract, being written into it, as any other stipulation therein.   The statute supervenes all policies issued under it, and writes out of them all stipulations inconsistent with itself.

2. It is also settled that "where several concurrent policies on a building have been written with the consent of the respective companies, each company is liable for the full amount

of its policy," under statutes like this. *Havens* v. *Germania Ins. Co.,* supra. The court well say: "We think there can be no valid reason why the mere fact that several companies assured, each a part of the whole risk, should affect the operation of the statute. If in order to induce good faith on the part of the insured, and thus give greater security to the insurer, the companies desire to make the owner bear a portion of the risk, this protection can readily be secured by limiting the amount of concurrent insurance. The insurance is written [as here] by the consent of all the companies, and it must be presumed, when each consented to the additional insurance by the others, that in its opinion and estimation the total-insurance was not excessive or disproportionate to the value of the property. The amount written in each policy is expressly assented to by all the other insurers, and they must be held to agree that the aggregate of their several policies is the value of the property. To hold otherwise is to repeal the statute in every case where there is more than one policy on the same property, whereas it was intended to apply to all. When we consider the well-known custom of the different agencies, representing often a number of companies, and distributing the insurance they write equitably among their several members, we can readily see how easily, under their contention, they can render the statute nugatory in the most important risk. We think the statute is obligatory in the concurrent as in the single policy;" citing *Oshkosh Gaslight Co.* v. *Germania Fire Ins. Co.,* 71 Wis., 454, and *Queen Ins. Co.* v. *Jefferson Ice Co.,* 64 Texas, 578.

The editor of the Am. R. R. & Corp. Rep., vol. 2, p. 578, commenting upon this decision of the supreme court of Missouri, says: "Under such statutes, if several policies are issued upon the same property, the full amount of each may be recovered." Besides the principle case the following sustain this proposition: *Reilly* v. *Franklin Ins. Co.,* 43 Wis., 449; *Cayan* v. *Dwelling House Ins. Co.,* 68 Wis., 515; *Oshkosh Gaslight Co.* v. *Germania Fire Ins. Co.,* 71 Wis., 454; *Barnard* v. *In-*

*surance Co.,* 38 Mo. App., 106; *Queen Ins. Co.* v. *Jefferson Ice Co.,* 64 Texas, 578." Of course it must be borne in mind that the concurrent insurance in this case was consented to.

3. It is also settled that the statute is not waived by accepting a policy prescribing a different rule for fixing the amount of the loss to be paid, not does it exclude the operation of the statute. *Queen Ins. Co.* v. *Leslie,* 47 Ohio St., 409; *Dugger* v. *Merchants' & Traders' Ins. Co.,* 95 Tenn., 245, s.c. 28 L. R. A., 796 (1895); and *Thompson* v. *Citizens' Ins. Co.,* 45 Wis., 388. Public policy, declared by the statute, cannot thus be contracted away.

The only points-pressed seriously here are that the contract was incomplete, and that the agent, Klein, conspired and colluded with Phelps to defraud his company, betraying the company in the interest of appellee. But the proof wholly fails on both propositions. The appellant had full knowledge through Klein, and its general agent, Dexter, at Atlanta, of the additional insurance, and this knowledge bound and estopped it if the consent had never been indorsed on the policy, especially so in view of the fact that the company received a premium with such knowledge and retained it, while defending. *Mitchell* v. *Ins. Co.,* 72 Miss., 53; *Home Ins. Co.* v. *Gibson,* 72 Miss., 58; *Ins. Co.* v. *First National Bank,* 73 Miss., 469.

*Affirmed.*